I wanted to introduce to the court some of the community leaders that may be in the audience who include Donna Tisdale, president of Backcountry, and Michelle Cuero, formerly the vice chair of the Campo Band, and other members and supporters of Backcountry. I regret I'm unable to attend today's hearing due to conflicts, but I'm very proud to be before this court and am eager to by way of introduction, the court is undoubtedly aware that there are three substantive claims in this case under the National Environmental Policy Act, the Migratory Bird Treaty Act, and the EGLE Act, and that most importantly for the court's review are the impacts potentially from this project on the rural community that includes those residing within the reservation and those outside the reservation who have formed together to ask this court to carefully review the district court's ruling which we believe is in error in several significant respects. They are prompted to seek this court's review because the project poses very substantial potential adverse impacts on their health and safety including nine distinct impacts from noise, impairment of wildlife suppression, aviation safety is endangered including aerial firefighting, visual impacts including shadow flicker, impacts on groundwater resources, impacts on golden eagles and other avian species, impacts on a rare keno checkerspot butterfly, socioeconomic impacts that flow from many of the physical impacts, and finally global warming impacts which stem in part from the fact that building a remote industrial scale power facilities depends on hundreds of miles of power lines which as we've seen in California has led to catastrophic wildfires as one of the witnesses explained in this case. Mr. Volker, can I? Yes. We're at a stage of this litigation where as I understand it the district court dismissed for failure to join an indispensable party, correct? Yes. Let me ask my question then. Assuming everything you just said is true and is well pleaded in the complaint, why was the district court wrong to find that there was a failure to join an indispensable party and tell me why our recent decisions in the Diné case and the Klamath case don't control the answer to that question. Yes, thank you your honor. There are five grounds for reversal. The first is that the district court employed an incorrect standard of review by flipping the burden of persuasion onto the plaintiff whereas under rule 12b7 the law is actually falls on the responding party or rather in this case it would be on the party making the motion to dismiss and we've explained that in the brief. The second issue is that the district court assumed that the Bureau of Indian Affairs compliance with environmental law would necessarily prevent rather than improve the project. Third, the district court ruled that plaintiffs failed to show how any relief can be tailored to address the Bureau of Indian Affairs failures. That was incorrect. And the fourth issue is that the district court did not correctly apply rule 19a and rule 19b and in particular under rule 19a the necessary or required party, a portion which I'll get to in a minute, and secondly under 19b the equity and good conscience test. Finally and misapplied the public rights exception. Now that you've summarized those I must tell you I'm most interested in the last one, the applications of rule 19a and 19b. Can you expound on those? Yes, I'd be happy to. As the court is very familiar under 19a the court applies the following test. In that person's absence, in this case the tribe's absence, can the court accord complete relief? The answer is yes it can. So that's not a factor that would counsel in favor of dismissal. The second test is whether the person who's absent claims an interest relating to the subject of the action and is so situated that disposing of the action in that person's absence may as a practical matter impair or impede the person's ability to protect the interest. And then this court in the Diné citizens case and the Klamath Irrigation District's case and many others articulated three factors that arise in applying that test. Before you get to the recitation of the factors let me give you my practical concern here. This is an action which in the end if you were successful would find invalid an existing contract. The parties might be free to go renegotiate another contract but at least the contract writes that Campo and Terrigen, which is a party, so they're not one of the absent parties, could have asserted would be abrogated. Why doesn't that mean that as to the Campo band this is a case that would affect their property rights? Well two answers. First of all no relief against the lease itself is sought. That was a misapprehension on the part of the district court. The lease went into effect in 2019 or the year before the contract was entered into and rather the BIA approval was issued in April 2020. The activities that would have occurred, so your position is that if you were successful Terrigen would still be responsible for paying on the lease even if it couldn't conduct the activities that it engaged in the lease to do? I don't know because I haven't seen the lease. It's not in the record. It's not an issue before the court. The second answer is that Terrigen shares the same interest in defending the lease even if the lease were at issue, which it's not. That's why I stopped you at this part of the analysis. That's a separate factor to be considered under Rule 19, which is to say whether there's an adequate representative. I'm trying to figure out what your position is about why the Campo band's interests wouldn't be affected by a judgment in the case. Well under the cases in applying Rule 19a, which is the subsection the court is referring to, the courts recognize that the adequacy of representation by an existing party defeats the argument that the absent party's rights would be impaired or impeded. The focus is on the issues presented in the litigation and only those issues. There are no sovereign immunity issues raised in this case. The only issues concern BIA's compliance with the APA in fulfilling its duties under those three environmental statutes. And those duties, if complied with, would likely result in a better project. But the bottom line, your honor, is that unlike the Klamath Irrigation District's case where there was no party that shared the tribal interest in maintaining their historic rights to use water in the Klamath River Basin and depending on that, the flows thus protected to enjoy the fishing rights that they had held for time immemorial. So in those cases, the court had no basis for finding that the interest of the absent tribes would be protected by the existing parties. Okay, so I just want to understand your position on this prong. Your position on this prong is that the Campo Band would be adequately represented in this case by Terry Jett. It's interest in defending the validity of the approval issued by BIA would be adequately defended. The courts apply a three-pronged test. No, I'm not asking what test the courts applied. I'm asking for your position. Your position is that Terry Jett could adequately defend the interests of the Campo Band, yes? Yes, because it has made the same arguments that the tribe would make. It is capable and willing to make those arguments and it is not suggested that it would offer any necessary element to the proceedings that the existing parties would neglect. On that point though, how is this case any different from the Diné Citizens case? It seems to me what you're saying here would have carried the day in that case too. It might well have had the court not determined that the Arizona Public Service Company had interests that were sufficient but not adequate. They were sufficient to raise some of the interests of the tribes, but they were not identical to the interests of the tribes. That takes me to the point I think we're both moving towards, is that even if they were equally motivated to defend the lease or in the Klamath case, the Arizona Public Service was equally motivated to defend the deal. The court said that's not enough because there's an issue of sovereignty here. I'm not sure in either of those cases, you know, sovereign interests were implicated other than the ability to enter into contracts that might benefit the tribe. So tell me how this case is different. Yes, in this case the only concerns raised in the complaint have to do with the Bureau of Indian Affairs compliance with the Administrative Procedure Act with administrative procedures that require adherence to requirements of three federal environmental statutes. Unlike Diné Citizens, there was no broad-scale challenge to an ongoing instrumental in, and had been for decades, in providing an economic undergirding for the tribe. But the Campo Band says in this case, gee, we have a contract with Terrigen, and under that contract they're doing things that benefit us and produce income for us and jobs for us, and if you are successful in this action, those activities will have to stop, at least as constituted. It's possible we may make another deal down the road, but it's not certain, and therefore we do have a tribal interest, separate and apart from the interest that Terrigen has in receiving the benefits of this arrangement. That's what they say. Tell me why that makes this case not the same as Diné. Well, here, the interests of Terrigen in the lease duplicate those of the tribe in defending the lease, even if the lease were at issue, which, as I've explained, it is not. So there is no other implication for tribal sovereignty. Mr. Volker, I have a question for you. Yes, certainly. If we grant relief to your clients and there's going to be an additional period of environmental review, does that not mean that we would have to vacate the BIA's approval? Well, that remains to be seen. As the Court is aware, in the Conner v. Burford case, the Ninth Circuit clarified the district court's ruling to make sure that the rights of the oil and gas companies that held leases would not be impaired during the remand when the government was directed to comply with NEPA and the Endangered Species Act. So, too, here, we would ask the Court to tailor its relief so as to assure that the requirements of environmental laws which protect both those who live on the reservation and those who do not, that those would be carried out. There is no showing whatsoever that achieving compliance with those federal laws would not result in a better project that both conform to federal environmental standards and protected the tribal interest in economic development. So that's the bottom line, is that that's a remedies question which this Court should remand for the district court to make determinations about. Can the district court, to go to Judge Gould's point, the district court doesn't have the power to rewrite the contract between the two, does it? All it can say is that the BIA erred in approving it. Whether or not a new contract results is up to the parties. Am I missing something? Well, the Court may not be aware that the lease has not been put into the record, so we don't actually know to what extent any rights flowing under it are dependent on BIA's approval and approval within a specific time frame since the lease was entered into a year before BIA issued its approval and benefits under it, including scholarship programs, were already underway before BIA approved it. But that's why I asked you the question at the beginning. It seems to me your position is if the district court rules in your favor, the tribe won't be hurt because Terrigen is compelled to continue to pay under the lease and the tribe can use those monies for its benefit. That puts aside the jobs that might but I'm having a hard time figuring out if the lease should have been disapproved, how Terrigen is required to continue to pay under it. That's simply not an issue that was before the district court. No, but it's a natural result. It's the natural result of the relief you're seeking, I think. Well, Your Honor, I think that that's an issue that has never been addressed because there's been no challenge to the lease. And I believe that the federal environmental laws protect those within the reservation as well as those without. And it would be an overstatement of the power of Rule 19 to frustrate implementation of federal environmental laws that protect all citizens, including those on the reservation and those in the communities. This case is much different from the others the court has referred to because here, the impacts of the project fall fully on surrounding communities that are not within the reservation. And moreover, we have a majority of those within the reservation who wish to be protected by the federal environmental laws that this case seeks to enforce. So this is a the court could, per Carnarvue-Burford and other cases, fashion relief that would give appropriate recognition to everyone's interests and achieve a better result, both from the environment and from the standpoint of economic development. Okay, Mr. Volkow, you're getting down in your time. Do you want to save the balance for rebuttal? Yes, thank you. Okay, very good. Let's hear from counsel on the other side. And I think first up is Ms. Hall. Thank you very much, Your Honor. May it please the court. Kendra Hall on behalf of Apelli Campobanda Degueno Mission Indians. It's a pleasure to be here today. I'll jump right to the first question that you were talking about, which is whether the tribe has an interest. And the declaration of Chairman Cuero goes through in great detail, not just the challenge that the tribe has faced in developing its property and supporting its people, but in great detail, the entry into the lease, the approval of the lease, the fact that BIA approval is required pursuant to 25 U.S.C. 415 for it to be effective, and exactly what will happen if the relief that is sought is granted to the plaintiffs in this case. Can you address the point that I was discussing with your friend? He says, we're fine with the lease. We're happy to have Terra Grande pay rent to the Campoband. We're just not happy with the activities that are going to be conducted. And therefore, the tribe wouldn't be hurt because it still would be paid under the lease. Right. Of course, that's inaccurate. And Chairman Cuero, his declaration provides those facts that the district court looked at in determining on a pragmatic level whether the tribe is going to be injured. And if the approval is overturned, he indicated in paragraph 43 of the declaration, we will lose our current and ongoing benefits. We will lose our jobs and the right to choose how our resources are used. And so, there is very specific key evidence in the record that supports the district court's decision on that issue. Can I raise an issue that we didn't have the opportunity to discuss with your friend, but I think is an implication of his argument. He says, look, the federal environmental laws are at issue here. Put aside the merits or demerits of his argument. And that ought to be enough, I'm now rephrasing his argument, to invoke the public policy exception, if you will, to Rule 19. What's your response to that? I think DNA and Cascoli actually are quite on point to your question, Your Honor. And the two issues that exist in this case that prevent the public rights exception are that, number one, we're looking at eviscerating a contract, and so we're taking away the tribe's entitlements. And number two, very importantly, the district court found that the public interests in the environmental laws did not transcend the private interests that are at stake. How do we review that finding? Is it de novo or with deference? I think it's for abuse of discretion because we're talking about the specific facts of this case. We're not asking for a blanket decision from this court that the public rights exception could never apply. But under the facts of this very specific case, the district court did its job. It looked at the record, and it found those very specific facts that support the finding. And for that reason, the discussion of Connor versus Buford is distinguishable because in that case, and DNA distinguished that case as well, the contract was not going to be invalidated like it is in this case. Plaintiffs have also raised an issue with the fact that the lease is not in the record. I think that's a red herring. There's no indication in many of the court's decisions that the court is looking specifically at lease provisions. We have evidence here in terms of what is the tribe's significant interest at stake. And so I think that really is irrelevant. Is it in the public record? I'm sorry. Is it in the public record? If I went to the Bureau of Indian Affairs records, I couldn't find it. No, in the ROD, it does confirm that the tribe authorized the lease and entered into it as a party. The plaintiffs also make that allegation in paragraph one of their first amendment complaint. And both in their opening brief, page 39, and their supplemental brief, page three, they indicate that the tribe is a party to the lease and receiving benefits under the lease. So I think that that issue has been squarely conceded in this case. And it was also not addressed in the opening brief. And so I think there would be issues of waiver in terms of challenging that in any evidentiary rulings in this case. You know, I know our cases have spoken to this, but I just want to ask you, apart from, and our more recent decision in Klamath, maybe you could just respond to this. You know, a common sense view of the landscape in these cases would be to say, well, listen, if you have a counterparty to the contract that's potentially vulnerable, surely that party has just as strong an interest as your client in defending it. I mean, personally, they entered into it because they were going to get benefits commensurate with whatever they thought they were giving up. And to the extent that there are any unique sovereignty interests that the tribe has, that the band has here, that the Bureau of Indian Affairs is present and presumably could, you know, speak to those issues as well. And so the combination of the counterparty of the contract and the Bureau of Indian Affairs, surely those two together would be able to adequately represent the band's interest here. Why is that not true? Well, in DNA, Your Honor, there was also the presence of the I think the point is, and I'm hearing a little bit, excuse me, conflating of the issues. It's not, you know, are we capable of raising defenses? It's what are your interests? What are your motivations? And the tribe's interests in this case are quite different than a purely financial interest of a third party. So are you arguing that the tribe is more motivated to defend this transaction in Terija? Yes, Your Honor, in some ways. You know, the tribe's land is static, Your Honor. We can't just go and build a windmill project somewhere else. We have limited resources on our land. Terijan is capable of taking their windmill development to any number of other properties. And so for the tribe and its land, and so much, as I know the Court is aware, for tribes tied to their land and decisions about their land, we are the party that needs to make those decisions. You know, and just to give an example, you know, Terijan may be interested in maximizing the most wind output from this project. You know, we have interest in our people and controlling access to our land and controlling the least disturbance to our land. And so to suggest that the interests are identical, I think is completely false. Are they financially identical? I mean, it strikes me that they may not be. Terijan could say, well, I guess if we can't do it this way, we'll go somewhere else and take our losses. But the tribe then, they may lose less money than the tribe. Exactly, Your Honor. We also, Chairman Cuero, indicated the impact that if that were to happen, if Terijan were to leave, because of frustration or delay or for whatever reason, that the difficulty the tribe would have in getting other business partners to team up with it. And it's so just... Is that an issue in Diné? I mean, it struck me in reading the case that, you know, I'm an Arizonan, so APS is a big utility company. And they might have wanted to go through with this transaction, but it wouldn't have affected them very much if it didn't go forward. But it would have affected the tribe in a very different way, because they wouldn't have been deprived of power. Is there an analogy here, or is that a different case? I think there's no daylight between the facts of Diné and this case. I mean, really, I feel like we're on all fours with that. And then the recent decision of Klamath just further reinforced that that is the precedent. So that leads to the second part of Judge Watford's question. Why isn't the BIA a sufficient party to represent your interests on that score? Thank you. Thank you. Because they too have different interests in ensuring compliance with the environmental laws that don't extend necessarily to the same sovereign interests that the tribe has. And I think that that was addressed in Klamath most recently, as well as in the Diné decision. Well, Ms. Hall, Judge Goulden, if I could interject a short question. It's the same one that I asked your friend, Mr. Volker. If we grant relief to the appellants, does that mean that we necessarily have to vacate the BIA approval of this lease? Yes. Their requested relief is that the approval be vacated. That is what they're requesting, and that the project be enjoined. So if it were to be remanded, even for a short period of time, though, even if that did not happen, Your Honor, the injury would still be to the tribe's project approvals, whether they are more restrictions. That all affects an entitlement in the bargain for contract that the tribe has. Thank you. Thank you. Thank you. Okay. Thank you very much. Let's hear now... All right. I was going to try to pronounce your name, but I think, is it Ms. Van Belligan? That's right. That's exactly right. Stacey Van Belligan. Good afternoon, Your Honor. I represent Tara Jen Development Company. I'd like to start with these questions of the relief sought and the questions of the lease, because really, the facts here are on all fours with Dineen citizens in this regard. The relief here, if you look at the first amended complaint, the prayer for relief basically attacks BIA's approval in the record of decision and of the land lease. And that's really important, because again, as we've noted, BIA approval is required by law for the lease to be effective, just as it was referenced by the court in Dineen citizens, because it was the same exact fact. You had a lease... What I heard from your friend was, well, you'll make a better deal for the environment next time. Respond to that. Well, so that's essentially conceding the prejudice to the tribe, because conceding that there would be a different project, that the project would be modified. You're under any legal obligation if this were vacated to enter into a different deal? No, that's an excellent point. I mean, this is really where the interests are quite divergent between Tara Jen as a private company and the tribe. First of all, I'd say that any delay is a prejudice to the tribe, because as the tribe noted in its brief, that the majority of benefits to the tribe accrue after construction and operation. So any delay for them is a prejudice. For Tara Jen, there are other considerations. So for instance, the project is going to rely upon financing. Private investors are loath to invest when there's pending litigation. So already there's divergent interest, because during the pendency of this litigation, this appeal, Tara Jen hasn't constructed the project, because it's waiting for the litigation to proceed. And so there's already that interest. If economic situations change, supply chain issues, inflation, and the project appears not to continue to be economically viable, there's a huge divergence of interest in that instance between Tara Jen as just a private company and the tribe. And this is exactly the same point that the court looked at in Dine Citizens, where Arizona Public Service Company's interest was purely in the approval, not the sovereign interests of the tribe in determining how its natural resources are used or how it provides critical government services for its members. And here, the relief sought clearly would destroy the lease. I would note that the argument here that, well, this doesn't really seek to affect the lease, that it's just seeking perspective relief against the federal agencies for compliance with environmental laws is precisely the argument that the plaintiffs in Dine Citizens made. And of course, the court in Dine Citizens recognized that because the lease wasn't effective without the Department of Interior approvals, that that certainly wasn't the case. I wanted to just touch on a moment about the point about the lease not being in the record, because I know that that has gotten a lot of interest. First, as the tribe pointed out, the chairman's declaration explained kind of the terms of the benefits based on the chairman's personal knowledge of negotiating the contract. But second, I would point out that BIA had the lease before it when it was evaluating the lease and deciding whether or not to approve it. BIA actually summarized certain provisions or terms of the lease in its final environmental impact statement, and that's in the federal defendant's supplemental excerpts of record. There are multiple references to certain terms of lease, including the fact that there's lease revenue, that there's job creation, and then other provisions. And so the fact is that although the record hadn't been produced yet before the district court, there was sufficient information to evaluate the tribe's interest in this case in the lease. And I take it it's clear from this record that your client couldn't do what it wants to do in the absence of a valid lease on the land. That's right, that's right. The lease isn't effective, and so the project can't be constructed unless there's a valid lease, since this is on I want to get to the point about Terrigen being an adequate representative because... Yeah, you seem very good. So why aren't you adequate? Well, there are several reasons. I already kind of pointed out two. The fact that there's already a divergent of interests in not constructing the project, and that delay injures the tribe because it delays their accrual of the benefits upon construction operation. I mentioned the more importantly, Terrigen doesn't have sufficient insight into the tribe's priorities, or how the tribe will articulate its interest to adequately represent them. Terrigen is a developer and has financial interests. Plaintiffs haven't cited to a single case where a court has determined that a private company adequately represents the tribe's interests, and we're aware of none. It really would be an extraordinary thing for a private company to be able to... Because I take it, at some point, the deal may not make economic sense to you, and that's a different issue for you than the tribe. That's right, and I think to Ms. Hall's point, the Terrigen can develop and does develop when generation all over. It can develop a project in a different location, but the tribe has its land and does not have the other opportunities for economic development. Okay. Okay. All right. Thank you. Thank you very much. We will hear last from Ms. Melton by Zoom. Good morning... Excuse me. Good afternoon, Your Honor, as I may please the court. Michelle Melton on behalf of the federal defendants. As our briefing reflects, the United States believes this case is fairly controlled by this court's recent precedent, particularly in DNA criticism. In that case, plaintiffs challenge the Department of the related to an energy project on tribal land. Despite the participation of the government and the project developer in the suit, this court held that neither party could adequately represent the absent tribe, and the suit in equity and good conscience could not proceed. In briefing DNA citizens, the government shared with this court its view that an Indian tribe is not a necessary party in an APA suit challenging federal agency action. Briefly, the United States does not believe the tribes and tribal entities are necessary parties required to be joined if or indispensable parties may not in equity and good conscience proceed under Rule 19B. But the government recognizes that it is a totally erroneous position, and also appreciates this court rejected the government's views in DNA citizens. Government sees no material distinction between that case and this one. As circuit precedent compels affirmance in this circumstance, we would ask the court to affirm. If there are no questions from the court, I would yield the remainder of my time and rest on our taking. You did not appeal in DNA. I mean, seek cert. No, Your Honor. We participated in the appeal as an amicus. Okay. Okay. Yeah, it doesn't look like we have any further questions for you. So thank you very much. Let's see. Is that the rebuttal time? Okay, Mr Volcker, you are you're up and you have time for rebuttal. Yes, thank you very much. Three points. First, with regard to DNA, in that case, the federal government did not aggressively advance the interests of the parties interested in developing the coal mine and the power plant. To the contrary, it failed to file an appellee's brief, and it had, in fact, advised the court that it took a sharply different view from the tribal interests with respect to the application of Rule 19. So that case does not stand for the proposition that where the federal government is involved that even if it is interested in defending the approvals that are challenged, that does not constitute adequate representation of the absent parties' interests. Here, by contrast, the federal government is aggressively making all of the arguments that the tribal interest and the developer have made. Moreover, we have here a party, Terrigen, whose interests are coterminous with those of the tribe with regard to the lease, which is only between those two entities and no one else, and the lease. So here we have a case where Terrigen would adequately represent the absent parties' interests. And just to recall, every time this court has addressed what is required for adequacy of representation, the three-factor test applied focused on the arguments that are made, whether the interests of a present party to the suit are such that it will undoubtedly make all of the absent parties' arguments, whether the party is capable and willing to make such arguments. Well, Mr. Booker, counsel for Terrigen says that we have never held that a private party in this posture would adequately represent the tribe's interests. Are you aware of such a case, or would this be the first case ever if we were to hold that? There are three district court rulings that we cited from Colorado, Oklahoma, and the District of D.C. that appear to be on point, and I would refer the court to those rulings. As we argue this morning, I am not aware of a Ninth Circuit ruling that would pair those variables the way they are paired here. However, I would urge the court to tread very carefully in this realm, as the court would naturally wish to do in any event, because what we don't want to do is displace with a rule of court the fundamental right of people who reside both in the reservation and outside the reservation to have the quality of life that the Congress intended that they enjoy pursuant to the statutes that we are attempting to enforce. That should be a paramount concern that animated the Conner v. Burford court in the finding that there was a way to both achieve the objectives of those important federal statutes as well as provide for moderation of any impact resulting to the private parties whose contract concerns were at stake. Okay, thank you very much for your arguments. Thank you to all counsel for your helpful arguments in this case. We appreciate it. The case just argued is submitted, and we are adjourned for this session. All rise. This court for this session stands adjourned.
judges: GOULD, WATFORD, HURWITZ